UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF WEST VIRGINIA
AT CHARLESTON


IVAN H. LEE, II,

      Plaintiff

v.                           Civil Action No. 2:08-0289

CITY OF SOUTH CHARLESTON, a
municipal corporation; FRANK
A. MULLENS, JR., in his official
capacity as Mayor of City of
South Charleston; BRAD L. RINEHART,
in his official capacity as the
Chief of Police for the City of
South Charleston; BOBBY YEAGER,
as an individual and in his
official capacity as a Police
Officer for the City of South
Charleston; D.J. PAULEY, as an
individual and in his official
capacity as a Police Officer for
the City of South Charleston;
and JOHN DOE, JOHN NOE, and JOHN
ROE, Police Officers of the City
of South Charleston, whose true
names are unknown,

      Defendants


MEMORANDUM OPINION AND ORDER


      Pending is the defendants' joint motion for summary judgment, filed March 6, 2009.  Also pending is the defendants' motion to exceed the page limit, which motion is ORDERED granted.

## I. Background

Plaintiff Ivan Lee is an African-American male who contends that he was the victim of racial profiling in the course of a roadside stop, detention, search, and seizure. (Compl. ¶ 1, 5). The incident giving rise to Lee's complaint occurred on May 5, 2006. According to Lee's deposition, late that afternoon, Lee met his friend Dominique Pleasant at the One Stop where Pleasant worked. (Lee dep. 36-37). They were later joined by Sean Price, another friend. (Id.). After Pleasant received a telephone call informing him that a friend named Nathaniel Moore had been pulled over by police near the 7-Eleven in South Charleston, Lee, Pleasant and Price left the One Stop together in a Ford Excursion driven by Lee and drove to the 7-Eleven. (Id. at 38-39).

They parked in the 7-Eleven parking lot and then walked "a couple hundred feet" to get a better view of the incident involving Nathaniel Moore. (Id. at 42). Lee states that he wanted to get a better view to see if Moore was being arrested because he was concerned and wanted to call Moore's mother and let her know what was happening to her son.[1] (Id.). While they

---

[1] Moore was charged with and plead guilty to simple possession of marijuana, a misdemeanor. (Municipal Court Docket Sheet Number 44559).

were observing the incident involving Moore, Pleasant received a phone call from a friend named Leslie, who apparently was near the 7-Eleven at the time, and she informed Pleasant that police officers had circled around Lee's parked Ford Excursion. (Id. at 53).

They returned to the 7-Eleven and went inside to get soft drinks and candy. (Id. at 55). Lee was approached by an undercover officer, and they "exchanged words." (Id. at 56). Lee asked the officer "Is there anything I can help you with? Is there a problem?" (Id. at 56). The officer responded, but Lee could not recall during his deposition what the officer said when he responded. (Id. at 59-60). Lee then told the officer "I know some attorneys," and the officer responded "No, I know attorneys better than you." (Id.). Lee decided to walk away after that, and went outside where Pleasant and Price were waiting. (Id. at 61).

Before they left the 7-Eleven, Lee asked his friends whether they had any drugs in their possession. (Id. at 68). Pleasant and Price both responded that they did not. (Id. at 69). Based upon their responses, Lee agreed to take them to Pleasant's house. (Id. at 71-72).

3

While Lee was driving away from the 7-Eleven, he noticed that he was being followed by a police car.  (Id. at 72). He drove past Pleasant's house and decided to keep driving to get away from the officer.  (Id. at 72-74).  While driving, he drove up on a curb.  As Lee describes it:

> [T]hey need to really cut this sidewalk out so cars can make it around.  When you make a turn-around, and obviously this is a wide vehicle, I believe there was another car in the other lane driving by me and the officer was behind me, and in order to not cause an accident, and I wasn't really swerving or anything, and the tire on the back, it went over the curb a little bit, and in the process of that, immediately it was like back on the road, and I just kept driving.

(Id. at 73).  Lee then approached a stop sign and came to a complete stop, and the officer, D.J. Pauley, turned on his lights.  (Id. at 75-76).

Officer Pauley got out of his vehicle at the stop sign and asked Lee for his license and registration, which Lee provided.  (Id. at 76-77).  Lee recognized that the officer was a K9 handler by the officer's uniform.  (Id.).  Lee asked the officer why he had been pulled over, and the officer told him that he had made several traffic violations.  (Id. at 80). According to the officer's statement, he observed Lee's vehicle pull out of the 7-Eleven parking lot without signaling and drive up on the curb in the 900 block of Montrose Drive, and at every

4

stop sign, the turn signal came on after the vehicle had stopped. (Defs.' Mot. Exhibit 3).

The officer took Lee's license and registration back to his vehicle, and when the officer returned, he asked Lee if he could search the vehicle. (Lee dep. 79). Lee said no and the officer asked Lee to step out of the vehicle. (Id.). At first Lee refused, stating that he did not think it was necessary for him to do so. (Id.). After the officer had asked him several times to step out, Lee acquiesced. (Id. at 81). When the officer took Lee around to the back of the vehicle, handcuffed him and patted him down, Pleasant and Price were still in the vehicle. (Id. at 81). According to Lee, when the officer handcuffed him, Lee said, "You don't need to do this." (Id. at 90). Lee added, "What is the reason for this? Why are you arresting me?", to which the officer responded, "I'm not. I'm just doing this for my safety." (Id. at 81).

While Lee was being frisked, two more officers arrived in an unmarked car. (Id.). Both had been at the 7-Eleven earlier with Lee. (Id. at 82). A fourth officer then arrived in a marked car. (Id.). The additional officers took Pleasant and Price from the car and searched them. (Id. at 82-83). Price admits that he consented to be searched. (Price dep. 13).

5

Pleasant stated in his deposition that he believes he objected to
the search, but cannot remember with certainty.  (Pleasant dep.
12).  According to the statement made by one of the officers,
both consented to be searched.  (Defs.' Mot. Exhibit 3).  Both
were found to be in possession of marijuana, estimated at five
grams each.  (Municipal Court Docket Sheet Numbers 44573, 44576).


After Pleasant and Price were searched and the
marijuana was found, the officer who frisked Lee returned and
searched him a second time.  (Lee dep. 84).  Lee was still in
handcuffs. (Id.).  When asked in his deposition whether he
expressly objected to this second search, Lee responded "Yes, I'm
pretty certain," then he stated:

> The first time, even when he handcuffed me, I said,
> "You don't need to do this."  When he came back again,
> he said, "I have to do all of this."  I said, "Uh-huh,"
> like I didn't want that to happen.  It was like "I
> don't understand why you're doing this."  I was really
> totally confused.

(Id. at 90-91).  At this juncture, the court assesses the "Uh-
huh" as being the equivalent of "No" when construed in light of
the phrase that immediately follows, "like I didn't want that to
happen," apparently meaning that Lee didn't want the further
search that was about to take place, presumably for drugs, to
occur.  According to the officer's statement, Lee consented.

6

(Defs.' Mot. Exhibit 3).

This second search lasted "just a few minutes."  (Id. at 91-92).  This time, the officer unbuckled Lee's belt, unbuttoned and unzipped Lee's pants, then "pulled [Lee's] underwear back, viewing for . . . seconds to . . . a minute or two . . ., looking around, trying to . . . move [Lee's] pants around."  (Id. at 89-90).  The officer also removed Lee's shoes and checked down his back and around his buttocks in the same way that he had checked Lee's genital area.  (Id. at 92).  Lee acknowledges in his deposition that his genitals were exposed only to the officer and not to the public.  (Id. at 91).  No drugs were found on Lee's person during the search.  (Id. 92).

The officer then informed Lee that the officers were going to search Lee's vehicle.  (Id. at 92-93).  The officers walked the dog around the vehicle, and the dog alerted, so the officers searched inside the vehicle.  (Id. at 93).  No drugs were found in the vehicle.  (Id. at 95).

The officers gave Lee a warning ticket and issued citations to Pleasant and Price for possession of marijuana. (Id. at 95; Uniform Traffic Ticket and Complaint Number 24000; Municipal Court Docket Sheet Numbers 44573, 44576).  Lee,

7

Pleasant and Price got back into the car and drove away.  (Lee dep. 95).

Lee instituted this action in federal court on May 2, 2008.  The following claims remain pending:

1.  Section 1983 claims against the City of South Charleston, its Mayor and Chief of Police, and the two officers in their individual capacities for violations of Lee's Fourth and Fourteenth Amendment rights and

2.  State tort claims of intentional infliction of emotional distress, assault, battery and false arrest against the officers.

## II. Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing

**8**

the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant.  Id.  The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial.  Fed. R. Civ. P. 56(c); id. at 322-23.  A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant.  Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

        Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party.  Anderson, 477 U.S. at 248.  Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute.  Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

        A court must neither resolve disputed facts nor weigh

9

the evidence, <u>Russell v. Microdyne Corp.</u>, 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility.  <u>Sosebee v. Murphy</u>, 797 F.2d 179, 182 (4th Cir. 1986).  Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor.  <u>Charbonnages de France v. Smith</u>, 597 F.2d 406, 414 (4th Cir. 1979).  Inferences that are "drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion."  <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962).

### III. The Fourth Amendment and § 1983

The Fourth Amendment guarantees "the people" the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.  Lee contends that the officers violated his Fourth Amendment rights when they stopped, seized, and searched him without reasonable suspicion that any violation or crime had been committed or was likely to be committed.  (Compl. ¶ 28).

10

A. The Basis for the Stop

The protections of the Fourth Amendment extend to brief investigatory stops of persons that fall short of traditional arrests. United States v. Arvizu, 534 U.S. 266, 273 (2002) (citing Terry v. Ohio, 392 U.S. 1, 9 (1968)). An officer may stop and briefly detain a person for investigative purposes, even in the absence of probable cause to arrest, if the officer has a "reasonable suspicion" that criminal activity is afoot. Terry, 392 U.S. at 22, 30. The officer must be able to articulate something more than an "inchoate and unparticularized suspicion or a 'hunch.'" Id. at 27.

The level of suspicion required for an investigatory stop is less demanding than that required for probable cause, which is defined as "a fair probability that contraband or evidence of a crime will be found." United States v. Sokolow, 490 U.S. 1, 7 (1989). However, like the concept of probable cause, the concept of "reasonable suspicion" is not "readily, or even usefully, reduced to a neat set of rules." Id. Rather, the existence of a reasonable suspicion is determined based upon a totality of the circumstances, including the information known to the officer at the time of the stop and any reasonable inferences

11

that could be drawn therefrom.  <u>Arvizu</u>, 534 U.S. at 274.  This
determination must be based on commonsense judgments and
inferences about human behavior.  <u>Illinois v. Wardlow</u>, 528 U.S.
119, 125 (2000).

     The defendants contend that the officers had reasonable
suspicion to stop Lee's vehicle based on a totality of the
circumstances which included Lee's interest in the stop of
Nathaniel Moore who was arrested for possession of marijuana,
Lee's encounter with the officers in the 7-Eleven, and his
evasive driving and subsequent moving violations.  (Mem. Supp.
Mot. 11-12).  Lee responds, citing to <u>Illinois v. Wardlow</u>, that
his presence in an area of suspected criminal activity, standing
alone, is not enough to support a reasonable suspicion that he
was committing a crime.  (Pl.'s Response 6-7).  He further
responds that even if he did fail to use his turn signal, it is
unclear whether that failure constituted a traffic violation
inasmuch as the law, according to Lee, requires the use of a turn
signal only if other traffic may be affected.  (<u>Id.</u> at 9-11).

     It is well established that the decision to stop a
vehicle is reasonable where the police have probable cause to
believe that a traffic violation has occurred.  <u>See, e.g., Wren
v. United States</u>, 517 U.S. 806, 810 (1996).  Although Lee

disputes whether he violated a traffic law by failing to use his turn signal, he does not deny that he drove over the curb while driving around a bend in the road in violation of West Virginia Code § 17C-7-9(a)(1). (Lee dep. 73). He describes how he went over the curb in his deposition, and, in his response brief, he states that he "denies any improper driving <u>other than that one incident</u>." (<u>Id.</u>; Pl.'s Response 3-4 (emphasis added)). Inasmuch as it is undisputed that the officer following Lee saw Lee's vehicle leave the lane of traffic and drive over the curb, the basis for making the stop was reasonable and did not violate Lee's Fourth Amendment rights.

## B. The Scope of the Stop

The Fourth Amendment further requires that an investigatory stop be reasonable in its scope in addition to being reasonable at its inception, that is, the officer's actions must be reasonably related in scope to the circumstances that justified the stop in the first place. <u>Terry</u>, 392 U.S. at 19-20. During a routine traffic stop, an officer may request a driver's license and vehicle registration, run a computer check, and issue a citation, but "[a]ny further detention for questioning is

beyond the scope of the <u>Terry</u> stop and therefore illegal unless the officer has a reasonable suspicion of a serious crime." <u>United States v. Rusher</u>, 966 F.2d 868, 876-77 (4th Cir. 1992).

In order to determine whether the scope of the stop was reasonable, the court considers the defendants' contention that the officers had a reasonable suspicion of criminal activity, aside from the traffic violation, to support their stop of Lee's vehicle, namely, Lee's interest in the stop of Nathaniel Moore who was arrested for possession of marijuana and Lee's encounter with the officers in the 7-Eleven.  The court finds these bases for reasonable suspicion to be dubious at best.  The actions of Lee and his friends can hardly be said to be distinguishable from that of innocent individuals in similar circumstances.  It is not uncommon for an innocent person to loiter in order to observe a traffic stop or the arrest of another individual.  Nor is it suspicious, without more, for an individual to avoid the questions of an officer or refuse to cooperate when the individual is approached by the officer but not detained.  Indeed in <u>Illinois v. Wardlow</u>, the Supreme Court distinguished between "unprovoked flight," which is inherently suspicious, and situations in which an individual "ignore[s] the police and go[es] about his business" or simply "refuses to cooperate,"

14

which are not inherently suspicious inasmuch as the individual
ordinarily has a right to ignore the police and go about his
business.  Wardlow, 528 U.S. at 125 (citing Florida v. Royer, 460
U.S. 491 (1983)).  Viewing these behaviors together under a
totality of the circumstances analysis, the court finds that a
reasonable factfinder could conclude that the officers lacked
reasonable suspicion that criminal activity was afoot.  And so,
at the outset and absent any conduct by Lee and his passengers
during the stop that would give the officers reasonable suspicion
or probable cause to further detain them, the traffic stop should
have been limited in scope to the routine procedures described in
Rusher.

        The court notes that it is not unreasonable for an
officer to ask a driver to step out of the vehicle during the
course of the stop.  See Pennsylvania v. Mimms, 434 U.S. 106, 111
(1977) (holding that the additional intrusion into a driver's
personal liberty by an order to step out of the vehicle after
having been stopped for a traffic violation is de minimus).  And
so, it was not unreasonable for the officer to order Lee to exit
his vehicle, but in order for the officer to lawfully frisk-
search Lee for weapons and conduct the additional search of Lee's
person for drugs, it was necessary that the officer have a valid

justification for doing so.


C. The Frisk-Search for Weapons


        With respect to frisk-searching, the United States
Supreme Court has held that if an officer is justified in
believing that an individual "whose suspicious behavior he is
investigating at close range is armed and presently dangerous to
the officer or to others . . . the officer [may] take necessary
measures to determine whether the person is in fact carrying a
weapon and to neutralize the threat of physical harm."  Terry,
392 U.S. at 24.  The officer need not be absolutely certain that
the person is armed; rather, the test is whether a reasonably
prudent person in the circumstances would be warranted in the
belief that his safety or that of others was in danger.  Id. at
27.  Unlike a search incident to an arrest, which can involve a
relatively extensive exploration of the person because it is
justified in part by the necessity to assure the safety of the
arresting officer but also on other grounds, a frisk search for
weapons, in the absence of probable cause to arrest, must be
limited to that which is necessary for the discovery of weapons
that could be used to harm the officer or others nearby.  Id. at
25.  The search must be strictly circumscribed because "[e]ven a

16

limited search of the outer clothing for weapons constitutes a
severe, though brief, intrusion upon cherished personal
security," and is surely "an annoying, frightening, and perhaps
humiliating experience."  Id. at 24-25.

The defendants briefly discuss the general purpose of
conducting a frisk-search, namely, the safety of the officer, but
they do not identify any evidence that would suggest that the
officer who frisked Lee reasonably believed that Lee and his
passengers were armed and dangerous and, so, a threat to his
safety.  See Terry, 392 U.S. at 24, 27.  Nor does the court find
that any of the evidence presented suggests that the officer
believed, or that a reasonable officer would be warranted in
believing, that Lee or his passengers were or might be armed and
presently dangerous.  United States v. Sakyi, 160 F.3d 164, 169
(4th Cir. 1998) ("Terry and Long require a specific, articulable
suspicion of danger before the police officers are entitled to
conduct a 'pat-down'").  Accordingly, the court is unable to
conclude on summary judgment that the frisk-search of Lee was
valid unless it appears from the undisputed facts that Lee
consented to it.

The defendants contend that Lee and each of his
passengers consented to be frisk-searched.  (Mem. Supp. Mot. 4).

17

Lee maintains that the officer lacked consent to search him.
(Pl.'s Response 8).  In his deposition, as earlier indicated,
Lee describes the circumstances leading up to the frisk as
follows:

> A:   He [the officer] asked me if I would step out of
>      the car and talk to him.  I said I didn't think
>      that was necessary. . . .  He asked me to step out
>      of the car a few times, I don't know how many
>      times.  He was like, "I need you to get out of the
>      car."  I believe he used like a more aggressive,
>      like I need to get out of the car."
>
> Q:   Like "Get out of the car now"?
>
> A:   Yes.  So I got out of the car.  Dominique and Sean
>      were still in the car.  We walked back.  He patted
>      me down and then he handcuffed me, or he might
>      have handcuffed me then patted me down. . . .  I
>      said, "What is the reason for this?  Why are you
>      arresting me?"  He's like, "I'm not.  I just have
>      to do this for my safety."

(Lee dep. 81).

Voluntary consent to search is an exception to the
Fourth Amendment prohibition of unreasonable searches and
seizures.  Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).
The court should consider the totality of the circumstances
surrounding the consent in determining whether consent to search
was freely and voluntarily given.  See id. at 227 ("[T]he
question whether a consent to a search was in fact 'voluntary' or
was the product of duress or coercion, express or implied, is a

18

question of fact to be determined from the totality of all the circumstances."). "In viewing the totality of the circumstances, it is appropriate to consider the characteristics of the accused (such as age, maturity, education, intelligence, and experience) as well as the conditions under which the consent to search was given (such as the officer's conduct; the number of officers present; and the duration, location, and time of the encounter)." United States v. Lattimore, 87 F.3d 647, 650 (4th Cir. 1996) (citing United States v. Watson, 423 U.S. 411, 424 (1976); United States v. Analla, 975 F.2d 119, 125 (4th Cir. 1992); United States v. Morrow, 731 F.2d 233, 236 (4th Cir. 1984)). It is also appropriate to consider whether the accused knew that he possessed a right to refuse consent, although the officers need not demonstrate that the accused knew of his right to refuse consent to prove that the consent was voluntary. Schneckloth, 412 U.S. at 248-49; United States v. Gordon, 895 F.2d 932, 938 (4th Cir. 1990).

Based upon Lee's testimony, it does not appear that Lee consented to be frisked. His questions to the officer, "What is the reason for this? Why are you arresting me?," could have indicated to the officer that he lacked Lee's consent. As the Sixth Circuit Court of Appeals has noted, even "a spoken assent

to search may be too ambiguous to establish consent in certain circumstances."  United States v. Carter, 378 F.3d 584, 588 (6th Cir. 2004) (citing United States v. Worley, 193 F.3d 380, 386 (6th Cir. 1999) ("You've got the badge, I guess you can [search]" is not consent where context was intimidating and defendant testified that he felt he had no choice.)).

Moreover, the United States Supreme Court has held that consent cannot be proven "by showing no more than acquiescence to a claim of lawful authority."  Bumper v. North Carolina, 391 U.S. 543, 548-49 (1968).  For example, when in Bumper the police entered a house, announcing that they had a warrant to search, and the occupant said "go ahead," the Supreme Court held that the occupant's consent was not voluntary.  Id.  The Court stated, "[w]hen a law enforcement officer claims authority to search a home under a warrant, he announces in effect that the occupant has no right to resist the search.  The situation is instinct with coercion -- albeit colorably lawful coercion.  Where there is coercion there cannot be consent."  Id. at 550.

Somewhat like the officer in Bumper who stated that he was operating under a warrant, the officer who frisked Lee stated he had to do so for his safety.  It may ultimately be found that, in response to the officer's statement to him, Lee did not

20

consent but merely declined to object to the pat down search, believing he had no choice but to acquiesce because the officer, by his chosen language, had expressed authority to search him. Under these circumstances, a reasonable factfinder could conclude that the officer lacked Lee's consent to perform the frisk-search.  Summary judgment is, accordingly, not proper on this issue.

D. The Second Search

The defendants contend that the officer had probable cause to conduct the second search of Lee's person, during which the officer checked around Lee's genitals and buttocks, once the officers found marijuana on both of Lee's passengers and because the drug dog alerted that there were drugs in the vehicle. Inasmuch as the dog alerted to drugs in the vehicle after Lee had already been searched, it is not relevant to the court's consideration of whether the officer had cause to conduct the second search.  The defendants cite to no authority in support of their assertion that their finding of minimal amounts of marijuana on Lee's passengers, estimated by the charging officer as five grams each, provided probable cause to make a highly intrusive search of Lee or even reasonable suspicion to further

detain him after the purpose of the traffic stop had ended.

Relevant authority on this issue is the United States Supreme Court's decision in <u>United States v. Di Re</u>, 332 U.S. 581 (1948).  Di Re was convicted on a charge of knowingly possessing counterfeit gasoline ration coupons after the police found him in a car with two other individuals, the driver and an informant who had purchased and had in his possession the counterfeit coupons from the driver.  <u>Di Re</u>, 332 U.S. at 582-83.  The Court held that the police lacked probable cause to arrest Di Re, who was thereupon searched and found to be in possession of counterfeit gasoline ration coupons, based on his mere presence in the same vehicle as the driver for whom the police did have probable cause to arrest.  <u>Id.</u> at 592.  This was particularly true under the circumstances where the alleged crime was not one that involved any visibly criminal act.  <u>Id.</u> at 593.  The court explained:

> The argument that one who 'accompanies a criminal to a crime rendezvous' cannot be assumed to be a bystander, forceful enough in some circumstances, is farfetched when the meeting is not secretive or in a suspicious hide-out but in broad daylight, in plain sight of passersby, in a public street of a large city, and where the alleged substantive crime is one which does not necessarily involve any act visibly criminal.  If Di Re had witnessed the passing of papers from hand to hand, it would not follow that he knew they were ration coupons, and if he saw that they were ration coupons, it would not follow that he would know them to be counterfeit.  Indeed it appeared at the trial to require an expert to establish that fact.  Presumptions

> of guilt are not lightly to be indulged from mere
> meetings.

Id.; compare id., with Maryland v. Pringle, 540 U.S. 366 (2003)
(holding that officers had probable cause to arrest driver and
two passengers where cocaine and contraband were found in glove
compartment and back-seat armrest of vehicle and none of the men
offered any information regarding the ownership of the drugs and
contraband on the ground that the drugs and contraband could have
been in the possession of any one of the three vehicle occupants
or all three of them jointly).

Although the Court in Di Re did not hold that the
presence of a companion of one who is presently committing a
crime can never provide probable cause as to the companion, it
suggested that those circumstances would be rare.  Here, like the
crime committed by the driver, which was not shown to have been
visibly criminal to Di Re, the crime being committed by Pleasant
and Price in Lee's presence, namely, misdemeanor possession of
minor quantities of marijuana on each's person, was completely
concealed in their clothing.  Unlike the drugs and contraband in
Pringle, which were located in the vehicle where any one of the
occupants could have been in control of it, the marijuana was on
the person of each of the passengers and cannot be said to have
been in Lee's control.  Lee's presence in the vehicle with two

persons who were carrying small amounts of marijuana on their
bodies, without more, did not give the officers probable cause to
further search him or reasonable suspicion to further detain him.
United States v. Branch, 537 F.3d 328, 336-37 (4th Cir. 2008)
("[A] prolonged automobile stop requires either the driver's
consent or a 'reasonable suspicion' that illegal activity is
afoot" and "[t]he driver's consent or reasonable suspicion of a
crime is necessary to extend a traffic stop for investigatory
purposes").  The reasonable suspicion required for further
detention for questioning is that of a serious crime.  See United
States v. Rusher, 966 F.2d at 876-77 (citing Florida v. Royer,
460 U.S. at 488-89).  No such crime is shown here.[2]

        Nor can the court conclude on summary judgment that Lee
consented to the search of his body for drugs.  As earlier noted,
when Lee was asked in his deposition whether he expressly
objected to this second search, Lee responded "Yes, I'm pretty
certain," then he stated:

    The first time, even when he handcuffed me, I said,
    "You don't need to do this."  When he came back again,
    he said, "I have to do all of this."  I said, "Uh-huh,"
    like I didn't want that to happen.  It was like "I

_____

    [2] Possession of less than fifteen grams of marijuana in
West Virginia is sufficiently minor that a first offense is
subject to dismissal and all record of it subject to expungement.
See W.Va. Code, §§ 60A-4-401(c), 407.

24

> don't understand why you're doing this."  I was really
> totally confused.

(Lee dep. 90-91).  As earlier construed, the words Lee says he

uttered can be taken to be his objection to the further search.

Moreover, according to Lee, the officer again indicates by his

statement to Lee that he is acting based upon lawful authority so

that it would not matter if Lee objected to the search.  Based

upon this dialogue, the court is unable to conclude that no

reasonable fact finder could find that the officer lacked Lee's

consent to be searched for drugs.[3]

In summary, the court concludes that the initial stop

of Lee's vehicle was supported by probable cause that Lee

committed a traffic violation.  The initial stop of Lee's vehicle

did not violate Lee's Fourth Amendment Rights.  However, the

officers exceeded the scope of the initial stop when, apparently

without reason to believe that Lee may be armed and dangerous,

they frisk-searched him for weapons.  Unless Lee consented to be

frisk-searched, the officers violated his Fourth Amendment rights

---

[3] Lee further argues that the nature of the second search amounted to a strip search in public.  Inasmuch as Lee concedes in his deposition testimony that his genitals and buttocks were never exposed to anyone but the officer conducting the search, the court does not agree.  If it is later determined that Lee consented to be searched for drugs, the lawful scope of the search will be determined by the scope of Lee's consent.

by frisking him.  Additionally, unless Lee consented to be
searched for drugs, the officers violated his Fourth Amendment
rights when they conducted the second search.  Questions of
material fact remain with respect to Lee's consent to both the
frisk-search and the search for drugs.

## IV. Equal Protection and § 1983

Lee contends that the defendants engaged in
intentional racial discrimination in performing an allegedly
unlawful search and seizure and thereby violated his right under
the Fourteenth Amendment to equal protection of the laws.
(Compl. ¶¶ 24-26).  The Equal Protection Clause of the Fourteenth
Amendment provides that "[n]o State shall . . . deny to any
person within its jurisdiction the equal protection of the laws."
U.S. Const. Amend. XIV, § 1.  The clause does not proscribe
states from making any classifications; rather, it "keeps
governmental decisionmakers from treating differently persons who
are in all relevant respects alike."  Morrison v. Garraghty, 239
F.3d 648, 654 (4th Cir. 2001) (quoting Nordlinger v. Hahn, 505
U.S. 1, 10 (1992)).  "To succeed on an equal protection claim, a
plaintiff must first demonstrate that he has been treated
differently from others with whom he is similarly situated and

26

that the unequal treatment was the result of intentional or purposeful discrimination." Id. "Once this showing is made, the court proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny." Id.

Lee alleges that he was subject to disparate treatment on the basis of his race. Classifications on the basis of race are "seldom relevant to the achievement of any legitimate state interest" and, therefore, "are deemed to reflect prejudice and antipathy -- a view that those in the burdened class are not as worthy or deserving as others." Id. (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440 (1985)). Accordingly, classifications based upon race are subject to strict scrutiny and are sustained only if they are narrowly tailored to serve a compelling state interest. City of Cleburne, 473 U.S. at 440.

As evidence of the disparate treatment of minority drivers in South Charleston, Lee has provided the court with a copy of the West Virginia Traffic Stop Study Final Report, February 2009, prepared by the Criminal Justice Statistical Analysis Center of the Division of Criminal Justice Services. The report shows the racial disparities in traffic stops and searches on a statewide, countywide and citywide basis for state

27

police departments, but it does not address racial disparity in the traffic stops and searches performed by officers employed by the City of South Charleston.  The statistics for stops made in South Charleston reflect only the actions of the state police detachment located in South Charleston, not of the municipal officers employed by the City.  This report is, accordingly, not probative on the City's use of racial profiling.

Although Lee may be able to show that the officers violated his Fourth Amendment rights, he has failed to provide any evidence that the officers did so on the basis of race and thereby violated his right to equal protection.  In order to succeed on an equal protection claim, he must show that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.  Morrison v. Garraghty, 239 F.3d at 654.  Lee speculates that the officers would not ask a white female driver to step out of her car and submit to a frisk-search and search for drugs, but he does not offer evidence in support of his speculation.  Summary judgment is proper on the plaintiff's Fourteenth Amendment claim inasmuch as he has not provided any evidence showing that the officers do not conduct similarly unconstitutional stops of white people, nor has he

offered evidence showing that the officers acted with a
discriminatory intent.


## V. Qualified Immunity


Qualified immunity bars section 1983 actions against
government officials in their individual capacity.  Brandon v.
Holt, 469 U.S. 464, 472-73 (1985).  Because it is an immunity,
and not merely a defense, it protects government officials not
only from liability, but also from the burdens of trial and
preparing for trial, so it must be addressed by the court at the
earliest possible stage of the litigation.  Hunter v. Bryant, 502
U.S. 224, 227 (1991); Mitchell v. Forsyth, 472 U.S. 511, 526
(1985).  "[I]t is effectively lost if a case is erroneously
permitted to go to trial."  Mitchell, 472 U.S. at 526.

The test for qualified immunity is a two-pronged
inquiry.  The court must determine (1) whether a constitutional
right has been violated on the facts alleged and (2) whether the
right was clearly established at the time so that it would be
clear to an objectively reasonable officer that his conduct

29

violated that right.[4]  Saucier v. Katz, 533 U.S. 194, 200-02
(2001).  A right is clearly established if "[t]he contours of the
right [are] sufficiently clear that a reasonable official would
understand that what he is doing violates that right."  Id. at
202.

        The court has already concluded that Lee's Fourth
Amendment rights may have been violated by the officers with
respect to the frisk-search and the search of Lee's person for
drugs.  It is clearly established that a person's Fourth
Amendment rights are violated when an officer acting under the
Terry exception to probable cause frisks the person without a
reasonable belief that the person is or may be armed and
dangerous.  Terry, 392 U.S. at 24.  It is clearly established as
well that a person's presence in a car with another who is
engaging in conduct that is not visibly criminal, standing alone,
is not enough to give the officer probable cause to arrest.  Di
Re, 332 U.S. at 592-93.

        It is also clearly established that, outside a search

---

    [4] The Supreme Court has recently clarified that the prongs
of the qualified immunity test need not be addressed in a
particular order; courts may use discretion in deciding which of
the two prongs should be considered first in light of the
circumstances of the particular case at hand.  Pearson v.
Callahan, -- U.S. --, 129 S. Ct. 808, 818 (2009).

incident to lawful arrest, an officer may not search a person beyond a safety pat down for weapons when the officer lacks probable cause that a crime is being committed.  <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373 (1993); <u>Ybarra v. Illinois</u>, 444 U.S. 85, 91, 93-94 (1979); <u>Sibron v. New York</u>, 392 U.S. 40, 65-66 (1968).

If the officers are entitled to qualified immunity in this action, premised on the evidence now before the court, it will be on the basis that a reasonable officer would have believed under the circumstances that he had consent to perform each of the searches of Lee.  But the court cannot so hold from the evidence before it.  Lee's deposition testimony, construed in the light most favorable to him, shows that he made statements which, although not entirely clear, would seem to have been sufficient to alert the officer that Lee objected to the search. Moreover, the deposition testimony shows that the officer made statements that could have indicated to Lee that the officer had legal authority to make the search so that the search could be performed whether Lee consented or not.  It is clearly established that where consent is given based upon a show of legal authority, the consent is not valid.  <u>Bumper v. North Carolina</u>, 391 U.S. 543, 548-49 (1968).

31

The court concludes based upon the evidence before it
that the defendants may have violated Lee's Fourth Amendment
rights on the occasion of each of the two searches of him and
that the rights violated were clearly established so that an
objectively reasonable officer would have known that he lacked
legal authority to perform each of the searches.  The defendants
are, accordingly, not entitled to qualified immunity at this
juncture.

## VI. Municipal Liability

In <u>Monell v. Department of Social Services of the City
of New York</u>, 436 U.S. 658 (1978), the Supreme Court of the United
States held that local governing bodies can be sued under section
1983 for monetary, declaratory, or injunctive relief where the
allegedly unconstitutional action reflects the implementation of
a local policy.  <u>Monell</u>, 436 U.S. at 690.  "[T]he touchstone of
the § 1983 action against a government body is an allegation that
the official policy is responsible for a deprivation of rights
protected by the Constitution," but local governments may also be
sued "for constitutional deprivations visited pursuant to

governmental 'custom' even though such a custom has not received
formal approval through the body's official decisionmaking
channels."  Id. at 690-91.  However, "a municipality cannot be
held liable solely because it employs a tortfeasor – or, in other
words, a municipality cannot be held liable under § 1983 on a
respondeat superior theory."  Id. at 691 (emphasis in original).

        Lee made sufficient allegations in his complaint about
city policies or customs of racial profiling, pretextual stops,
and failure to adequately train, supervise, control and
discipline officers to survive a motion to dismiss.  (Compl. ¶¶
1, 22).  In response to the defendants' motion for summary
judgment, Lee cites to the West Virginia Traffic Stop Study Final
Report, February 2009, which the court has found not probative of
the practices of the City of South Charleston municipal police.
Lee has provided no other evidence to support his allegations of
a municipal policy or custom.  His § 1983 claims against the City
of South Charleston are, accordingly, dismissed.

        VII. Intentional Infliction of Emotional Distress

        Lee asserts that he suffered shock, embarrassment and
severe mental distress as a result of being subjected to

33

"outrageous conduct intentionally imposed upon him by the Defendant officers to humiliate and embarrass him, to wit: a roadside strip search." (Compl. ¶ 37-38). The tort of outrageous conduct, also called intentional infliction of emotional distress, "permits the recovery of damages for emotional distress arising out of extreme and outrageous conduct intentionally or recklessly caused by the defendant." <u>Harless v. First Nat'l Bank in Fairmont</u>, 169 W. Va. 673, 693, 289 S.E.2d 692, 703 (1982). To succeed on a claim of outrageous conduct, a plaintiff must show:

> One, the wrongdoer's conduct was intentional or reckless. This element is satisfied where the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result. Two, the conduct was outrageous and intolerable in that it offends against the generally accepted standards of decency and morality. This requirement is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved. Three, there was a causal connection between the wrongdoer's conduct and the emotional distress. Four, the emotional distress was severe.

<u>Id.</u> at 704.

The West Virginia Supreme Court has indicated that the court must consider whether a defendant's actions might reasonably be interpreted as outrageous, stating:

> In evaluating a defendant's conduct in an intentional

or reckless infliction of emotional distress claim, the
role of the trial court is to first determine whether
the defendant's conduct may reasonably be regarded as
so extreme and outrageous as to constitute the
intentional or reckless infliction of emotional
distress. Whether conduct may reasonably be considered
outrageous is a legal question, and whether conduct is
in fact outrageous is a question for jury
determination.

Hatfield v. Health Management Associates of W. Va., 223 W. Va.

259, 672 S.E.2d 395, 404 (2008).

Lee characterizes the officer's search of his body for
drugs as a "strip search."  Indeed, he alleged in the complaint
that the officer conducted the search of Lee's genitals "in full
view of passing traffic."  (Compl. ¶ 19).  However, in his
deposition testimony, Lee admits that his genitals were exposed
only to the officer and never to the public.  (Lee dep. 91).
Inasmuch as Lee's genitals were not exposed to public view and he
offers no other evidence to support his claim that he was
subjected to outrageous conduct, the court concludes that the
officer's conduct can not reasonably be regarded as so extreme
and outrageous as to constitute the tort of intentional
infliction of emotional distress.  The defendants are entitled to
summary judgment on this claim.

VIII. State Tort Claims of Assault, Battery and False Arrest

35

Lee alleges that the officers' actions constituted an unlawful touching and caused him to be in imminent fear of bodily injury.  (Compl. ¶ 31).  Lee also alleges that he was illegally detained by the officers.  (Compl. ¶ 34).

The defendants defend on the ground that the officers were lawfully permitted to detain and search him.  Restatement (Second) of Torts § 121 describes such a defense, stating:

> Subject to the rules stated in §§ 127-132, a peace officer acting within the limits of his appointment is privileged to arrest another without a warrant. . .
>
> (b) if, although no act or omission constituting a felony has been committed, the officer reasonably suspects that such an act or omission has been committed and that the other has committed it. . . .

Restatement (Second) of Torts § 121 (emphasis added).

Inasmuch as the court finds quite dubious the grounds on which the defendants base their reasonable suspicion to detain and search Lee, namely, his interest in the arrest of Nathaniel Moore, his encounter with the officers in the 7-Eleven store, and his friends' possession of marijuana on their persons, the court is unable to conclude on summary judgment that the officers reasonably suspected that Lee had committed a crime.  They are, accordingly, not entitled to this defense.

36

### IX. The West Virginia Governmental Tort Claims and Insurance Reform Act

The West Virginia Governmental Tort Claims and Insurance Reform Act provides that:

> (b) An employee of a political subdivision is immune from liability unless one of the following applies:
>
> (1) His or her acts or omissions were manifestly outside the scope of employment or official responsibilities;
>
> (2) His or her acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or
>
> (3) Liability is expressly imposed upon the employee by a provision of this code.

W. Va. Code § 29-12A-5(b).

The defendants contend that the officers are immune from liability under this section of the Act. Lee responds that the officers are not immune because their conduct falls within the exception for actions taken with malicious purpose, in bad faith, or in a wanton or reckless manner. For reasons similar to those on which the court concluded that the defendants were not entitled to qualified immunity on Lee's § 1983 claims, the court concludes that a reasonable factfinder could find that the defendants acted in bad faith when they searched Lee. The defendants are, accordingly, not entitled to summary judgment on

37

the plaintiff's state tort claims under the West Virginia
Governmental Tort Claims Act.

## X. Conclusion


In conclusion, the court finds that Lee's § 1983 claim
for violation of the Equal Protection Clause of the Fourteenth
Amendment should be dismissed as alleged against all defendants,
and his remaining § 1983 claim, for violation of his Fourth
Amendment right to be free from unreasonable search and seizure,
should be dismissed as alleged against the City of South
Charleston, Mayor Mullens and Chief of Police Rinehart inasmuch
as Lee has failed to prove a municipal policy or practice.  Lee
may proceed against the officers in their individual capacities
on his § 1983 claim for violation of his Fourth Amendment rights,
as they have not been shown to be entitled to qualified immunity
for exceeding the scope of a stop for a traffic violation by
conducting a frisk-search without consent or reason to believe
that Lee was armed and dangerous and by conducting a search of
Lee's person for drugs without consent or probable cause to
believe a crime was being committed.  Lee may also proceed
against the officers with his state tort claims of assault,
battery and false arrest, but his claim of intentional infliction

38

of emotional distress is dismissed.

It is, accordingly, ORDERED that the defendants' motion for summary judgment be, and it hereby is, granted to the extent the defendants seek dismissal of

1.  Lee's § 1983 equal protection claim;

2.  Lee's remaining § 1983 claims against the City of South Charleston, Mayor Mullens and Chief of Police Rinehart; and

3.  Lee's claim of intentional infliction of emotional distress,

and is otherwise denied.  Inasmuch as no claims remain pending against the City of South Charleston, Mayor Mullens and Chief of Police Rinehart, it is ORDERED that the City of South Charleston, Mayor Mullens and Chief of Police Rinehart be, and they hereby are, dismissed from this action.

The Clerk is directed to forward copies of this written opinion and order to all counsel of record.

DATED: August 28, 2009

John T. Copenhaver, Jr.
United States District Judge

39